UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERONDA GARNER,

       Plaintiff,                                      No. 06-13318

v.                                             Magistrate Judge R. Steven Whalen

GRENADIER LOUNGE, ET.AL.,

       Defendants.
_____/

**OPINION AND ORDER REGARDING DAMAGES**

This is a pregnancy discrimination case brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et. seq.*, and Michigan's Elliot-Larsen Civil Rights Act (ELCRA), M.C.L. §37.2101, *et.seq.* On July 16, 2007, the Court granted summary judgment to the Plaintiff on these two claims,[1] and ordered a hearing on damages. The matter was referred to the undersigned Magistrate Judge, and the parties consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. §636(c). On December 18, 2007, an evidentiary hearing was held on the issue of damages. Following this hearing, the parties filed supplemental briefs

The Plaintiff seeks several categories of damages, each of which will be discussed

---

[1] The Complaint also alleged a state law claim of intentional infliction of emotional distress. However, the Plaintiff's motion for summary judgment addressed only the Title VII and ELCRA claims.

-1-

separately.

## A. Back Pay

In a Title VII case, there is a presumption in favor of awarding back pay in order to effectuate the statutory goal of "mak[ing] persons whole for injuries suffered on account of unlawful employment discrimination." *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Back pay is generally awarded from the date of the plaintiff's discharge through the date of judgment. *Suggs v. Servicemaster Education Food Management*, 72 F.3d 1228, 1233 (6th Cir. 1996); *Shore v. Federal Express* Corp., 777 F.2d 1155, 1159 (6th Cir.1985) ("victorious Title VII plaintiffs are presumptively entitled to back pay until the date judgment is entered in the case"); *Terbovitz v. Fiscal Court of Adair Cty.*, 825 F.2d 111, 118 (6th Cir. 1987), *abrogated on other grounds*, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Awards of back pay are addressed to the court's discretion. *Suggs,* 72 F.3d at 1233; *Wheeler v. Southland Corp.*, 875 F.2d 1246, 1251 (1989).

A Title VII plaintiff has a duty to mitigate damages. *Suggs*, 72 F.3d at 1233. However, the burden of showing that a plaintiff did not use reasonable care and diligence to mitigate damages is on the defendant. *Ford v. Nicks*, 866 F.2d 865, 873 (6th Cir.1989), *citing Rasimas v. Michigan Department of Mental Health,* 714 F.2d 614, 623 (6th Cir.1983), *cert. denied,* 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 537 (1984). Where a plaintiff does mitigate damages through interim employment, the wages so earned will reduce the amount of back pay recoverable:

> "Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable...." 42 U.S.C. § 2000e-5(g).

In this case, the Defendants have not met their burden of showing that Plaintiff failed to mitigate her damages. "An employee is not required to go to heroic lengths in attempting to mitigate his damages, but only to take reasonable steps to do so." *Ford v. Nicks*, 866 F.3d at 873. A plaintiff's diligence in seeking employment is assessed in view of the "individual characteristics of the claimant and the job market." *Id.*, quoting *Rasimas*, 714 F.2d at 624. Here, Plaintiff testified that following her termination, she tried to find work as a waitress, bartender, or any other kind of work, through job fairs, internet postings, and "out walking, driving, looking for work." Tr. 12/18/07, pp. 32, 41. That she was unable to find a job is not surprising, given that since 2005, the economy in Detroit and southeastern Michigan has gotten progressively more dismal. For a period of time in 2007, however, she did obtain employment with a janitorial service. Because I accept the Plaintiff's testimony as to mitigation, and because Defendants have not met their burden of showing that Plaintiff was not diligent in seeking new employment, I find that the Plaintiff is entitled to back pay, and I will proceed to determine the amount.

The Plaintiff was terminated on November 15, 2004. She testified that as a waitress and bartender, she received wages of $5.25 per hour, and she estimated her combined income, which included wages plus tips, at $520 to $525 per week. She stated that she worked at least five days per week, Friday through Tuesday, and that she earned more in tips that she did in salary. She said that the tips were better on weekends and during special

occasions such as private parties.

The Defendants do not dispute the salary rate of $5.25 per hour. Exhibits D-1 (payroll account information from the Grenadier Lounge) and D-2 (copies of payroll checks issued to the Plaintiff between April 29, 2004 and November 11, 2004), show that Plaintiff was paid weekly, for a period of 28 weeks. The total wages paid for that time was $2,506.63, for an average of $89.52 per week, or approximately $358 per month. Thus, if Plaintiff is correct in her estimation, she would have earned approximately $430 per week in tips, almost five times her salary.

The Plaintiff has the burden of establishing her damages, and while her testimony is sufficient to meet her burden of production, it is not necessarily controlling as to her burden of persuasion, even if it stands unrebutted.[2] *Walker v. Bain*, 257 F.3d 660, 674 (6th Cir. 2001).

While it is not unusual for a waitress or bartender to earn more in tips than in salary, the Plaintiff's estimate that her tips exceeded her salary by a factor of five appears highly inaccurate. Indeed, the reliability of the Plaintiff's recollection is undercut not only by her failure to support her testimony with tax documentation, but by her testimony that she worked 25 to 30 hours per week, when Defendants' Exhibits D-1 and D-2 (the checks and

---

[2]Contrary to her argument, Plaintiff's testimony as to her tip income was not completely unrebutted. While Defendants did not offer any affirmative evidence as to the amount of tips the Plaintiff received, they did impeach the Plaintiff's testimony based on her failure to corroborate her estimate with her 2004 tax return. Plaintiff testified that she claimed her tip income on her tax return, but did "not have that with [her]" at the hearing. Tr. 12/18/07, p. 30.

payroll records) show that at $5.25 per hour, she would have worked only approximately 17 hours per week.

How, then, can we more accurately establish the Plaintiff's average monthly tip income? Some courts have found that tips for waitresses range from approximately one to three times the amount of wages. *See, e.g., Jackson v. McCleod*, 748 F.Supp. 831, 836 (S.D. Ala. 1990); *EEOC v. Anderson's Restaurant of Charlotte, Inc.*, 666 F.supp. 821, 838 (W.D.N.C. 1987); *Thurber v. Jack Reilly's Inc.*, 521 F.Supp. 238, 241 (D.C. Mass. 1981). In this case, the financial statements of the Marracci Temple/Grenadier Lounge (Defendants' Exhibits C-1 through C-5), as well as the testimony of Aaron McDaniel, the current treasurer, show that from 2003 to 2006, the gross income never exceeded $250,000, that the lounge operated at a net loss in 2003 and 2004, and that cash flow was minimal. In other words, the financial profile of the Grenadier Lounge appears to be more that of a neighborhood bar than a high-end entertainment establishment, with tipping commensurately less generous.

In addition, statistics reported by the State of Michigan Jobs & Career Portal show that the national median earnings for waiters and waitresses in 2004, including wages and tips, were about $8.70 per hour. *See* www.michigan.gov/careers/0,1607,7-170-46398-64659–00.html.

In view of all these factors, it is reasonable to valuate the Plaintiff's tip income as equal to her salary of $5.25 per hour, based on a 17-hour week. This would give her an effective hourly rate of $10.50 per hour, somewhat above the national mean, and would put her weekly income at $10.50 x 17 hours, or $178.50. The Defendants' exhibits also show

that on average, she was paid four times per month. Hence, her monthly income will be set at $714.00. She was terminated on November 15, 2004; from that date to the date of the final judgment entered in this case is 42 months. The back pay would therefore be $29,998.00.

However, Plaintiff testified that from September through December 17 of 2007, a period of 15 weeks, she worked 20 hours per week for Sparkle Janitorial, at a salary of $8.75 per hour. Her total earnings at Sparkle, $2,625, operate to reduce her back pay, pursuant to 42 U.S.C. §2000e-5(g). Accordingly, she will be awarded back pay in the adjusted amount of $27,373.00.

### B. Front Pay

"Front pay is...simply compensation for the post-judgment effects of past discrimination." *Shore v. Federal Express Corp., supra,* 777 F.2d at 1158. An award of front pay is discretionary with the court, and may be appropriate if "an award of back pay does not fully redress a Title VII plaintiff's injuries." *Id.*, at 1159. Some of the factors to be considered are "an employee's duty to mitigate, 'the availability of employment opportunities, the period within which one by reasonable efforts may be re-employed, the employee's work and life expectancy, the discount tables to determine the present value of future damages and other factors that are pertinent on prospective damage awards.'" *Id.*, at 1160, quoting *Koyen v. Consolidated Edison Co.*, 560 F.Supp. 1161, 1168-69 (S.D.N.Y. 1983); *Suggs, supra*, 72 F.3d at 1234.

In this case, Plaintiff has met her duty to mitigate with regard to back pay, which represents a period of 42 months from her termination to the date of judgment. However,

there comes a point where, as bad as the economy and the general job market may be, a part-time waitress or bartender can reasonably be expected to find comparable employment, particularly given the generally high turnover rate in this line of work. *See* State of Michigan Jobs & Career Portal, *supra* ("Job openings [for waiters and waitresses] are expected to be plentiful because of the high turnover among part-time workers."). Moreover, the State of Michigan predicts a growth in such jobs over the next couple of years:

> "Employment of Waiters and Waitresses in Michigan is expected to increase about as fast as the average for all occupations through 2010. An average of 5,070 openings is expected annually, with 930 due to growth and 4,140 due to replacement of workers who retire, die, or leave the labor force for other reasons. Additional openings will occur as workers change jobs or occupations." *Id.*

Thus, as an experienced waitress in a growing market, the Plaintiff has a reasonable opportunity to mitigate her future damages by obtaining employment as a part-time waitress, comparable to her work at the Grenadier Lounge.

Any Title VII award must be reasonable. "An employee who was discriminatorily discharged must be made whole, but is not entitled to a windfall." *Suggs*, 72 F.3d at 1234. The award of back pay, along with compensatory damages as discussed below, sufficiently redresses the Plaintiff's injuries under Title VII. Based on the above factors, I decline to award front pay.

### C. Lost Earnings from Work as a Medical Assistant

During the time she was employed at the Grenadier Lounge, the Plaintiff was enrolled in a six-month medical assistant program at the Lawton School of Business. She testified

that although she received financial aid for most of her tuition, she was required to pay $100 per month for the program, which ended in December of 2004. She testified that because she lost her job in November, she was unable to make the final $100 payment, and therefore had to quit the program. She stated that the school was unwilling to work with her on the last payment. At the evidentiary hearing, she presented Department of Labor statistics purporting to show that the mean hourly wage for medical assistants was $13.07 per hour. She claims that had she been able to complete the program, she would have been working as a medical assistant, at that wage, 40 hours per week for the past 36 months. Based on these calculations, she claims $74,880.00 in lost earnings as a medical assistant.

Damages must be ascertainable with reasonable certainty. They cannot be speculative, remote or uncertain. *Coal Resources, Inc. v. Gulf & Western Industries, Inc.*, 865 F.2d 761, 772, fn.4 (6th Cir. 1989); *Rodgers v. Fisher Body Division, General Motors Corporation*, 739 F.2d 1102, 1107 (6th Cir. 1084). Under this standard, the Plaintiff's claim is self-defeating: *if* she finished the program, she *may* have gotten a job as a medical assistant, *possibly* for 40 hours a week, that *might* have paid $13.00 per hour. Or maybe not.

Plaintiff's claim for lost wages as a medical assistant is purely speculative, and will be denied.

### C. Defaulted Loan

Plaintiff claims that because her unlawful firing forced her to withdraw from the medical assistant program at the Lawton School of Business, she is liable for a $6,400.00

student loan. Her testimony on this point was somewhat sketchy. She was not sure where her tuition money came from, but she said it was to be paid directly to the school upon her completion of the program. She said that she would have to repay $5,775.00 if she did not complete the program, but she did not know to whom. She stated, "I believe it's on my credit. An that $5,000 amount was on there, so that's what this has to be." *Id.*, pp. 57-58.

The only documentation offered was Plaintiff's Exhibits 10 and 11, documents from the Lawton School. Exhibit 10 shows that the total tuition, plus registration fee, was $6,400.00. The third page of Exhibit 10 indicates a PELL grant in the amount of $4,050.00 and a Federal Supplemental Educational Opportunity Grant (FSEOG) in the amount of $1,294.00. Both PELL and FSEOG awards are grants, not loans, and are given based on the student's financial need. If a student drops out of school, he or she may be required to repay some portion of such a grant, depending on when he or she dropped out and what portion of the grant was used to pay tuition.

Plaintiff has offered no evidence that she took out a loan, or that there has been any action taken against her to recoup any portion of her PELL and FSEOG awards, by the school, the government, or anyone else. Even assuming that her termination was the proximate cause of her failure to complete the program, she has failed to support her claim for $6,400.00 in damages beyond speculation. That claim will therefore be denied.

### D. Compensatory Damages for Emotional Distress

Compensatory, or non-economic damages for emotional distress are recoverable in a Title VII case, so long as the plaintiff supports such claim with competent evidence. *Carey*

*v. Piphus*, 435 U.S. 247, 264, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *Turic v. Holland Hospitality, Inc.*, 85 F.3d 1211, 1215 (6th Cir. 1996). A Title VII or ELCRA plaintiff can prove emotional injury based on his or her own testimony, and without medical support. *Id.; Moody v. Pepsi-Cola Metropolitan Bottling Co.*, 915 F.2d 201, 210 (6th Cir. 1990); *Wiskotoni v. Michigan Nat'l Bank, West*, 716 F.2d 328, 389 (6th Cir. 1983), *citing Birkhill v. Todd*, 20 Mich.App. 356, 365-66, 174 N.W.2d 56, 60-61 (1969).

The Plaintiff testified that after she was fired, she had to apply for public assistance for her and her child, a process she found degrading and embarrassing. She was fired shortly before the Thanksgiving and Christmas holidays, and was unable to provide a proper Christmas for her child. She was, of course, pregnant with a second child at the time of her termination, and stated that because of lack of transportation, she would sometimes miss doctors' appointments. After she was fired, she was evicted from her residence, and "had to move in with family until we got on our feet again." (Tr. 12/18/07, pp. 23-25). The Plaintiff testified that all of these problems caused emotional stress. *Id.*, pp. 23, 36. She discussed her emotional problems with her OB/GYN doctor, who referred her to a social worker. *Id.*, pp. 52-53.

I find this testimony competent and sufficient to establish that the Plaintiff suffered emotional injury as a result of being wrongfully terminated. *See Turic, supra*, 85 F.3d at 1215-16. In *Turic*, the Sixth Circuit affirmed the district court's award of compensatory damages to a pregnant, economically vulnerable plaintiff:

"The [district] court, in the instant proceeding, found that as a young, unwed

-10-

mother who was walking an 'economic tightrope' and who had just discovered she was pregnant for a second time, Turic was in a particularly vulnerable position and was highly dependent upon her job. Vulnerability is relevant in determining damages." *Id.* at 1215.

This description fits the Plaintiff. She is entitled to damages for emotional distress.[3]

As to the amount, courts have, in similar cases, upheld awards ranging from $38,900, *see Means v. Jowa Security* Services, 176 Mich.App. 466, 440 N.W.2d 23 (1989)(plaintiff testified that the financial strain resulting from his termination caused him to suffer embarrassment and humiliation), to $150,000, *see Moody, supra* (plaintiff testified that he was shocked and humiliated, and forced to live apart from his family because of his termination). [4]

In the final analysis, Plaintiff is entitled to compensation for emotional injury, but not to the extent that it would be grossly excessive or constitute a windfall. In view of Plaintiff's testimony, her financial and emotional vulnerability at the time she was wrongfully terminated, and the totality of the circumstances in this case, I find that an award of $35,000.00 for emotional damages is appropriate. This amount is well within the range of

---

[3]The *Turic* court noted that the plaintiff's "vulnerability is particularly relevant in this case, because her supervisors had direct knowledge of her vulnerability before they discharged her." *Id.* In this case, Plaintiff's Exhibit 1, a transcript of a meeting between the Plaintiff and the Board of Marracci Temple, shows that the Defendants were made well aware of the Plaintiff's dire financial straits.

[4] Neither party presented direct evidence as to the number of employees employed by the Marracci Temple/Grenadier Lounge. However, based on the financial statements, and particularly the figures for payroll taxes, it appears that the number of employees is far less than 101; therefore, pursuant to 42 U.S.C. §1981a(b)(3), compensatory damages in this case would be capped at $50,000.

awards in similar cases.

### E. Punitive Damages

42 U.S.C. §1981a(b)(1) provides that a Title VII plaintiff may recover punitive damages she or he "demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." Congress has therefore created a higher standard of liability for punitive damages than for compensatory damages. *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 534, 119 S.Ct. 2118, 144 L.Ed. 2d 494 (1999). The defendant's state of mind is the foremost consideration in a punitive damages analysis. "[A]n employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id.*, 527 U.S. at 536. In other words, the statutory terms "malice" and "reckless indifference" "pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Id.*

Applying this standard to her claim for punitive damages, the Plaintiff refers to her 12th Request to Admit, which the Court previously deemed admitted in granting summary judgment:

> "12. Please admit that the Marracci Temple No. 13 and/or The Grenadier Lounge knew, on November 15, 2004, that plaintiff's separation from employment could potentially violate federal laws against pregnancy discrimination."

Under *Kolstad*, this admission establishes "reckless indifference" sufficient to support

-12-

the Plaintiff's claim for punitive damages under §1981a. However, by its terms the admission is binding only on Defendants Marracci Temple and Grenadier Lounge; it is not binding on the individual Defendants Edward Brooks and Earl Suber. Furthermore, I find no evidence that Brooks or Suber acted with malice or reckless indifference.

The amount of punitive damages is entrusted to the Court's discretion, limited by the statutory cap of $50,000 on combined punitive and compensatory damages set forth in 42 U.S.C. § 1981a(b)(3). Plaintiff's Exhibit #1, the transcript of the Defendants' Board's meeting with the Plaintiff, shows that they wanted to lay off the Plaintiff because of fear that a pregnant woman might get injured during her employment, and the club might have liability if she did.[5] The Plaintiff provided the Defendants with a doctor's clearance for her to work, to no avail.

"In contrast to compensatory damages, which are designed to compensate victims for actual harm suffered as a result of another's wrongful conduct, the purpose of punitive damages is grounded in retribution and deterrence." *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 998 (6th Cir. 2007), citing *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 432, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). In *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 419, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), the Supreme Court stated that "[t]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." In *Campbell*, the Court

---

[5]One Board member stated that "things happen in a bar and the Board does not want anything bad to happen to you which could get us in trouble."

set forth the following framework for assessing reprehensibility:

> "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. *It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.*" *Id.* (Emphasis added).

The Defendants' conduct in this case was ill-advised and paternalistic, and it certainly violated the law. But can it be characterized as reprehensible? The Defendants did not show a "reckless disregard" for the Plaintiff's health and safety; to the contrary, their perhaps misplaced concern for her health motivated their actions. They did not engage in trickery or deceit, and this appears to be an isolated incident rather than part of a pattern of misconduct. On the other hand, of course, the Defendants did act with knowledge of the Plaintiff's vulnerability.

The Plaintiff has received economic and compensatory damages totaling $62,373.00. As the Court noted in *Campbell*, there is a presumption that this adequately compensates her for her injuries. While some award of punitive damages is justified, the facts of this case do not justify a high amount. I find that $1,000 is sufficient to satisfy the underlying goals of punishment and deterrence.

## F. Conclusion

For these reasons, the Court will enter judgment in favor of the Plaintiff and against the Defendants as follows:

<u>Against all Defendants, Jointly and Severally</u>

Back pay: $27,373.00

Emotional damages: $35,000.00

<u>Against Defendants Marracci Temple/Grendadier Lounge Only</u>

Punitive Damages: $1,000.00

TOTAL AWARD TO PLAINTIFF: $63,373.00

SO ORDERED.

S/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: July 15, 2008

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 15, 2008.

S/Gina Wilson
Judicial Assistant